1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

WARD E. BRAKEMAN,                    ) Case No. CV 13-3775-JPR
                                     )
                  Plaintiff,         )
                                     )
            vs.                      ) **MEMORANDUM OPINION AND ORDER**
                                     ) **AFFIRMING COMMISSIONER**
CAROLYN W. COLVIN, Acting            )
Commissioner of Social              )
Security,                            )
                                     )
                  Defendant.         )
                                     )

**I.    PROCEEDINGS**

        Plaintiff seeks review of the Commissioner's final decision
denying his applications for disability insurance benefits
("DIB") and supplemental security income ("SSI").  The parties
consented to the jurisdiction of the undersigned U.S. Magistrate
Judge under 28 U.S.C. § 636(c).  This matter is before the Court
on the parties' Joint Stipulation, filed March 5, 2014, which the
Court has taken under submission without oral argument.  For the
reasons stated below, the Commissioner's decision is affirmed and
this action is dismissed.

1

**II.   BACKGROUND**

Plaintiff was born on November 30, 1961.  (AR 48, 159, 161.) He attended about two years of college but did not earn a degree. (AR 49.)  He previously worked as a master control operator and assistant director for television networks.  (AR 50-54.)

Plaintiff filed applications for DIB and SSI on September 2, 2009.  (AR 86-89, 159-63.)  He alleged that he had been unable to work since March 2006[1] because of closed brain injury, arthritis, and fibromyalgia.  (AR 159, 161, 200.)  After his applications were denied, he requested a hearing before an Administrative Law Judge.  (AR 106-07.)

A hearing was held on June 22, 2011.  (AR 42-85.) Plaintiff, who was represented by counsel, testified, as did a medical expert and a vocational expert.  (Id.)  In a written decision issued August 1, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 26-37.)  On March 29, 2013, the Appeals Council denied his request for review.  (AR 1-6.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence

_____

[1]Plaintiff listed an onset date of March 26, 2006, in his DIB application (AR 159) but March 20 in his SSI application (AR 161).

2

means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is

3

currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.

---

[2]    RFC is what a claimant can do despite existing exertional and nonexertional limitations.  §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since March 26, 2006.  (AR 28.) At step two, the ALJ concluded that Plaintiff had severe impairments of "depressive disorder and status post closed head injury."  (Id.)  The ALJ did not find any "supportive evidence for a diagnosis of lumbar impairment[,] fibromyalgia," or "severe musculoskeletal impairment" and thus did not find that those conditions were severe.[3]  (AR 30.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a Listing.  (Id.)  At step four, the ALJ determined that Plaintiff had the RFC to perform "a reduced level of light work"; specifically, he could

> sit, stand or walk up to six hours each in an 8-hour
> workday.  The claimant can do simple routine work tasks
> and is limited to doing semiskilled work tasks at most,
> consistent with SVP 3 and 4.  He can only occasionally
> contact or interact with coworkers, supervisors or the

---

[3]Plaintiff does not contest these findings.  (See J. Stip. at 2.)

general public.  He is further limited to doing no work
in a fast-paced environment and is limited to doing low-
stress  jobs,  defined  as  only  occasionally  making
judgments.

(Id.)  At step four, the ALJ found that Plaintiff was unable to
perform his past relevant work.  (AR 35.)  Based on the VE's
testimony, however, the ALJ determined that Plaintiff could
perform jobs existing in significant numbers in the national and
regional economies.  (AR 36.)  Thus, the ALJ found that Plaintiff
was not disabled.  (AR 37.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in (1) according only
limited weight to treating physician Vernon Lackman's opinion,
(2) discounting Plaintiff's credibility, (3) failing to properly
assess various third-party statements, and (4) failing to fully
and fairly develop the record.  (J. Stip. at 2.)  For the reasons
discussed below, remand is not warranted on any of these bases.

A.   <u>The ALJ Did Not Err in Assessing Dr. Lackman's Opinion</u>

Plaintiff contends that the ALJ "did not provide legitimate
reasons to reject Dr. Lackman's assessment of [Plaintiff's]
mental RFC."  (J. Stip. at 4.)

1.   <u>Background</u>

On September 30, 2005, while working as a contractor at an
amusement park, Plaintiff fell from a ladder and hit his head.
(AR 219.)  He reported losing consciousness twice at the scene
but was noted to be awake, alert, and oriented when paramedics
arrived.  (AR 219, 223.)  At the emergency room, a doctor noted
that Plaintiff was "alert and coherent" but complained of head

6

and neck pain and had a two- to three-centimeter scalp laceration.  (AR 219, 221.)  A CT scan of Plaintiff's head revealed "evidence of a soft tissue contusion of the scalp, but no fracture or intracranial abnormality," and a CT scan of his cervical spine showed "some mild degenerative joint disease" but no other abnormalities.  (AR 221.)  Plaintiff was diagnosed with acute head injury, acute cervical strain, probable concussion, and a nonsuturable scalp laceration.  (Id.)  He was released from the hospital that same day.  (AR 226, 228.)

On May 18, 2006, Maura Mitrushina, Ph.D., who was board certified in clinical neuropsychology, and Ellen Shirman, Psy.D., who specialized in clinical neuropsychology, conducted a comprehensive neuropsychological evaluation of Plaintiff.[4]  (AR 242-54, 260-72.)  After conducting a clinical interview and administering 18 psychological tests, they concluded that Plaintiff was

> a bright individual who is functioning within the superior range of general intellectual ability. His fund of general information and vocabulary, word generation, access to lexical network, and abstract reasoning abilities represent prominent strengths.  However, his information processing efficiency is compromised somewhat by weakness in concentration/working memory.  Formal assessment of [Plaintiff's] memory functions indicated that his basic memory mechanisms are intact.  However, his ability to remember and adequately respond to

---

[4]This evaluation apparently took place at the request of Plaintiff's attorney.  (See AR 274.)

1    environmental stimuli is compromised by concentrational
2    weakness.  This problem is frequently misinterpreted by
3    patients as indication of poor memory.
4  (AR 270.)  Drs. Mitrushina and Shirman further noted that
5  "[s]cores on the tests measuring severity of emotional
6  disturbance placed [Plaintiff] within the moderate range of
7  depression."  (Id.)  They also noted, however, that Plaintiff's
8  scores on a validity scale were "indicative of individuals who
9  might have exaggerated their problems and symptoms as in a plea
10 for help."  (AR 268.)  The doctors "expect[ed] continuing
11 improvement in [Plaintiff's] cognitive functioning within the
12 next several months" but could not "predict the rate or extent"
13 of his "cognitive recovery."  (AR 271.)
14     On February 14, 2007, Dr. M.G. Salib, who specialized in
15 psychiatry,[5] reviewed Plaintiff's medical records and completed a
16 psychiatric-review-technique form and mental-RFC assessment at
17 the Social Security Administration's request.  (AR 309-22.)  In
18 the PRT form, Dr. Salib opined that Plaintiff suffered from
19 "[o]ccasional episodes of confusion" that resulted in "mild"
20 difficulties in maintaining concentration, persistence, or pace.
21 (AR 309-10, 317.)  In the mental-RFC form, Dr. Salib opined that
22 Plaintiff suffered from moderate limitations in his ability to
23 understand, remember, and carry out detailed instructions but was

24

25     [5]Dr. Salib's electronic signature includes a medical specialty
26 code of 37, indicating psychiatry.  (AR 309); see Program
   Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin.
27 (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089;
   POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012),
28 http://policy.ssa.gov/poms.nsf/lnx/0426510090.

1 | not significantly limited in any other area.  (AR 320-21.)

2 |     On July 3, 2007, Dr. Shirman reevaluated Plaintiff.  (AR

3 | 255-59.)  After performing a clinical interview and administering

4 | eight psychological tests, she concluded that Plaintiff

5 | "continues to experience attention/working memory difficulties,

6 | which interfere with his ability to register/encode new

7 | information into his long-term memory," and that his "current

8 | performance on tests of attention/concentration and verbal

9 | learning remains unchanged from the original evaluation."  (AR

10 | 259.)  She noted that Plaintiff "continues to experience

11 | significant levels of depression and anxiety."  (Id.)  Dr.

12 | Shirman also found that Plaintiff's results on two validity

13 | scales "indicated that [he] exaggerated his symptoms and

14 | problems," which she believed could be a "cry for help," and that

15 | "interpretations must be modified to correct for the over

16 | reporting of symptoms and problems."  (AR 258.)

17 |     On February 9, 2010, L. Roman, Ph.D., performed a

18 | consultative psychological examination of Plaintiff at the Social

19 | Security Administration's request.  (AR 350-53.)  Dr. Roman noted

20 | that Plaintiff's mood was depressed and his affect was "somewhat

21 | anxious" and "not appropriate to content."  (AR 351.)  Plaintiff

22 | was oriented to person, place, time, and situation and his

23 | attention and concentration were good, his thought process was

24 | logical and organized, his thought content and perception were

25 | normal, and his insight and judgment were adequate.  (Id.)  After

26 | administering four psychological tests, Dr. Roman diagnosed

27 | depressive disorder.  (AR 352.)  He believed that Plaintiff had

28 | mild limitation in social functioning and no limitation in

understanding and memory, sustained concentration and persistence, or adaptation.  (AR 353.)

On February 26, 2010, psychologist Preston Davis[6] reviewed Plaintiff's medical records and completed a PRT form.  (AR 354-65.)  Dr. Davis found that Plaintiff had an affective disorder that was not severe and resulted in no limitations.  (AR 354, 357, 362, 365.)  On March 17, 2010, he reviewed additional records and reaffirmed his assessment.  (AR 369.)  On July 29, 2010, Dr. Balson[7] reviewed Plaintiff's medical records and affirmed Dr. Davis's assessment.  (AR 371-72.)

At the June 22, 2011 hearing, testifying expert Glenn Griffin, Ph.D., a professor of clinical psychology, noted that Plaintiff had complained of cognitive limitations since suffering a head injury in September 2005.  (AR 56.)  He opined, however, that Plaintiff's two neuropsychological assessments – by Drs. Mitrushina and Shirman and Dr. Roman – failed to identify "any consequential neurological or cognitive impairment":

> In both assessments, the claimant's intellectual and
> memory functioning are either in the high average or
> superior range.  For example, his full-scale IQ in the

---

[6]Dr. Davis's electronic signature includes a medical specialty code of 38, indicating psychology.  (AR 354); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

[7]The record does not reflect Dr. Balson's first name or area of specialization.

> consultative examination is 122 and 124[8] in the earlier
> examination.  These are quite consistent and quite high
> –  would  place  him  at  approximately  the  90th
> percentile. . . .  [T]hese records by my review did not
> establish  the  presence  of  any  significant
> neuropsychological impairment.

(AR 57.)  Dr. Griffin also noted that Plaintiff's scores on psychological testing of "working memory" were "lower scores that were still in the average range," which was "consistent with no limitation."  (AR 69-70.)  He noted that since 2005, Plaintiff had been suffering from "a major depressive disorder, which is chronic, mild to moderate in severity."  (AR 58.)  Dr. Griffin testified that Plaintiff had no restriction in performing activities of daily living or maintaining concentration, persistence, or pace, but he would have "mild" difficulty in social functioning.  (AR 59.)

On July 6, 2011, Dr. Lackman completed a mental-RFC questionnaire form, noting that he had treated Plaintiff every three months since October 2005.  (AR 384-88.)  Dr. Lackman listed his "clinical findings" as poor memory, impaired concentration and judgment, and depression.  (AR 384.)  He believed that Plaintiff's deficits were "permanent."  (Id.)  Dr.

---

[8]Drs. Mitrushina and Shirman's report actually reflects a full-scale IQ of 121, which they categorized as "within the Superior range of general intellectual ability."  (AR 247, 265.)

Lackman noted that Plaintiff's symptoms included adhedonia,[9]
decreased energy, thoughts of suicide, feelings of guilt or
worthlessness, impaired impulse control, anxiety, mood
disturbance, difficulty thinking or concentrating, persistent
disturbances of mood or affect, emotional withdrawal or
isolation, psychological or behavioral abnormalities and loss of
previously acquired functional abilities, emotional lability,
memory impairment, and sleep disturbance.  (AR 385.)

Dr. Lackman believed Plaintiff was "unable to meet
competitive standards" in remembering worklike procedures;
maintaining concentration for two hours; working in coordination
with or proximity to others; completing a normal workday or
workweek; performing at a consistent pace; responding
appropriately to changes in a routine work setting; dealing with
normal work stress; understanding, remembering, and carrying out
detailed instructions; setting realistic goals independently; and
dealing with the stress of semiskilled and skilled work.  (AR
386-87.)  He was "seriously limited [in], but not precluded
[from]," understanding, remembering, and carrying out very short
and simple instructions; maintaining regular attendance;
sustaining an ordinary routine; making simple work-related
decisions; asking a simple question or requesting assistance;
accepting instructions and responding appropriately to criticism
from supervisors; getting along with coworkers; being aware of

---

[9]Anhedonia is "a psychological condition characterized by
inability to experience pleasure in normally pleasurable acts."
Anhedonia, Merriam-Webster, www.merriam-webster.com (last accessed
July 22, 2014).

normal hazards; interacting with the public; and using public transportation.  (<u>Id.</u>)  Dr. Lackman believed that Plaintiff would miss more than four days a month because of his impairments or treatment.  (AR 388.)  The earliest date to which his description of Plaintiff's limitations applied was October 2005.  (<u>Id.</u>)

### 2.  <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

13

1    When a treating or examining doctor's opinion is not

2    contradicted by some evidence in the record, it may be rejected

3    only for "clear and convincing" reasons.  See Carmickle v.

4    Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008)

5    (quoting Lester, 81 F.3d at 830-31).  When a treating or

6    examining physician's opinion is contradicted, the ALJ must

7    provide only "specific and legitimate reasons" for discounting

8    it.  Id.  The weight given an examining physician's opinion,

9    moreover, depends on whether it is consistent with the record and

10   accompanied by adequate explanation, among other things.

11   §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6).

12       3.  Analysis

13   The ALJ found that Plaintiff "established that he has memory

14   and concentration problems and tends to avoid socializing outside

15   the family" but had "not established an inability to work in an

16   environment where he could work with things and perform simple

17   routine tasks."  (AR 33.)  As a result, the ALJ formulated an RFC

18   for a range of light work limited to "simple routine work tasks,"

19   "semiskilled work tasks at most," only "occasional[] contact or

20   interact[ion] with coworkers, supervisors or the general public,"

21   "no work in a fast-paced environment," and only "low stress jobs,

22   defined as only occasionally making judgments."  (AR 30.)  The

23   ALJ noted that the RFC assessment was "supported by Dr. Shirman's

24   psychological tests" and by "the objective portion" of Dr.

25   Roman's assessment.  (AR 33.)  The ALJ "rejected" Dr. Lackman's[10]

26   opinions regarding Plaintiff's "remaining mental residual

27   _____

28   [10]The ALJ misspelled Dr. Lackman's name as "Lachman."  (See AR
     33.)

14

1  functional capacity."[11]  (Id.)  Contrary to Plaintiff's

2  assertion, the ALJ provided specific and legitimate reasons for

3  rejecting Dr. Lackman's opinion.

4      The ALJ permissibly discounted Dr. Lackman's mental-RFC

5  assessment because it was "inconsistent with the psychological

6  examinations and his own clinical records." (AR 33); see

7  §§ 404.1527(c)(4) (explaining that more weight should be afforded

8  to medical opinions that are consistent with the record as a

9  whole), 416.927(c)(4) (same); Valentine v. Comm'r Soc. Sec.

10 Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction

11 between treating physician's opinion and his treatment notes

12 constitutes specific and legitimate reason for rejecting

13 opinion); Houghton v. Comm'r Soc. Sec. Admin., 493 F. App'x 843,

14 845 (9th Cir. 2012) (holding that ALJ's finding that doctors'

15 opinions were "internally inconsistent, unsupported by their own

16 treatment records or clinical findings, [and] inconsistent with

17 the record as a whole" constituted specific and legitimate bases

18

19      [11]Dr. Lackman also completed a "Fibromyalgia Residual
20 Functional Capacity Questionnaire," opining that Plaintiff, for
   example, could sit or stand only 15 minutes at a time and a total
21 of less than two hours in an eight-hour workday, needed to take 15-
   to 30-minute breaks "hourly or more," suffered from "persistent"
22 pain rated an 8 on a scale of 10, and would miss more than four
   days of work a month as a result of his impairments or treatment.
23 (AR 390-92.)  The ALJ rejected Dr. Lackman's assessment as
   unsupported by his treatment notes and inconsistent with the
24 examining physician's opinion; the ALJ also concluded that
   Plaintiff's alleged fibromyalgia, lumbar impairment, and
25 muscoskeletal impairment were not severe. (AR 30, 34.)  Plaintiff
   has not challenged those findings, instead arguing only that the
26 ALJ's rejection of Dr. Lackman's assessment of Plaintiff's mental
27 RFC was in error. (See J. Stip. at 4 (arguing that ALJ "did not
   provide legitimate reasons to reject Dr. Lackman's assessment of
28 [Plaintiff's] mental RFC").)

1   for discounting them).

2        Indeed, as the ALJ found (AR 29, 33-34), Drs. Mitrushina's
3   and Shirman's assessments reflected that Plaintiff had a
4   "superior" IQ of 121, sustained attention throughout the lengthy
5   evaluation sessions,[12] and had good executive function, problem-
6   solving ability, and reasoning (AR 247-49, 256, 265-67).  They
7   found that Plaintiff's basic memory mechanisms were intact, but
8   he had difficulty with attention and working memory, which
9   interfered with his ability to "register/encode new information
10  into his long-term memory."  (AR 259; see also AR 252, 270.)  The
11  ALJ credited those findings and found that they were consistent
12  with an RFC for a limited range of simple, routine work.  (AR 29,
13  34.)  Testing by Dr. Roman, moreover, showed that Plaintiff had
14  an IQ of 122 (AR 352) – which Dr. Griffin noted was in the 90th
15  percentile (AR 57) and the ALJ classified as "superior" (AR 34) –
16  and that his weakest scores were in visual working memory,
17  immediate memory, and delayed memory (AR 352).  Although Dr.
18  Roman found that Plaintiff had only "mild" limitation in social
19  interaction (AR 353), the ALJ concluded that the "objective test
20  results do indicate some cognitive problems and support a
21  limitation from highly detailed/complex job tasks, and limited
22  social interactions."[13]  (AR 34.)  The ALJ also noted that the
23  assessment of Dr. Ursula Taylor, who performed an internal-
24  medicine evaluation of Plaintiff, provided an "additional reason"

25

26        [12]Drs. Mitrushina and Shirman's initial evaluation apparently
27  involved six hours of psychological testing.  (See AR 274.)

28        [13]The ALJ mistakenly noted that Dr. Roman found no functional
    limitations.  (AR 34.)

                              16

for rejecting Dr. Lackman's assessment (AR 30, 33); indeed, she noted that Plaintiff was oriented, had an "adequate" memory, could describe the details of his medical history, was in no distress, and established a good rapport with the examiner (AR 346).[14]  Indeed, none of the examining physicians' objective findings support Dr. Lackman's opinion that Plaintiff suffered from, for example, "serious" limitations in understanding or carrying out even short and simple instructions, making simple work-related decisions, asking simple questions or requesting assistance, or being aware of normal hazards.  (AR 386.)

As the ALJ noted, Dr. Lackman's opinion was also unsupported by his own treatment notes, which reflect very few objective findings regarding Plaintiff's mental functioning.  (AR 33.)  In October 2005, when, Dr. Lackman stated, his findings of limitations first applied (AR 388), he noted that Plaintiff may

---

[14]Plaintiff takes issue with the ALJ's reliance on Dr. Taylor's observations because she was "not a mental health physician," but nothing mandates that a physician have a certain specialization in order for the ALJ to consider her observations.  Indeed, Plaintiff's treating physician, Dr. Lackman, apparently did not specialize in psychiatry, either.  (See AR 62 (claimant's attorney's statement at hearing that Dr. Lackman was "not a psychiatrist").)  Plaintiff also objects to Dr. Taylor's indication that she is "board eligible" (J. Stip. at 3), but the American Board of Medical Specialties explicitly "recognizes physicians' legitimate need for a way to signal their preparations for Board Certification through the term 'Board Eligible.'" ABMS Maintenance of Certification (MOC) and Continuous Maintenance of Certification (C-MOC) Overview 8 (last updated Sept. 2013), available at http://www.namss.org/Portals/0/StateAssociations/New%20Hampshire/ABMS%20MOC_CMOC_BoardEligibility%20Overview_9_2013.pdf.

have "intermittent very mild dysarthria[15] and at times his cognition seems somewhat slow," but he "look[ed] overall well" (AR 279).  In November 2005, Plaintiff reported that he was "better" but had not returned to his previous level of functioning, stating that he was having problems with forgetfulness, balance, and headaches.  (AR 278.)  Upon examination, however, Dr. Lackman noted that Plaintiff "overall looks well," "[t]here is no apparent dysarthria and cognition seems grossly intact," "[c]erebellar function is normal on palpation," "[b]alance is normal," and "[t]andem walking is normal."  (Id.)  Dr. Lackman referred Plaintiff to neurology for an evaluation and noted that "[i]n the absence of demonstrable neurologic deficits," he was "not recommending another scan of [Plaintiff's] brain" and would "defer the recommendation to Neurology."  (Id.)

In December 2005, Dr. Mark C. Schultz, a board-certified neurologist, examined Plaintiff, diagnosed a concussion, and recommended an MRI.[16]  (AR 285-86.)  In January 2006, Dr. Lackman noted that the MRI "showed no structural lesion" and that Dr. Schultz had advised Plaintiff that he would continue to improve and "should return to the baseline."  (AR 277.)  Indeed, although Plaintiff reported that he tired easily and his memory and

---

[15]"Dysarthria is when you have difficulty saying words because of problems with the muscles that help you talk."  Dysarthria, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/007470 .htm (last updated July 9, 2014).  "In a person with dysarthria, a nerve, brain, or muscle disorder makes it difficult to use or control the muscles of the mouth, tongue, larynx, or vocal cords, which make speech."  Id.

[16]Dr. Schultz's note is largely illegible.

18

thinking were not clear toward the end of the day, his cognition had "significantly improved." (Id.) Dr. Lackman noted that Plaintiff's "[a]ffect, behavior and cognition seem grossly intact" and diagnosed "[t]raumatic brain injury, slowly improving." (Id.)

Indeed, although subsequent treatment notes reflect Plaintiff's continued reports of significant cognitive deficits (see generally AR 273-76, 323-28, 373-83), Dr. Lackman often failed to record any objective psychological abnormalities at all (see, e.g., AR 276 ("overall looks well," "[c]erebellar function is normal," "speech seems fluent"), 275 ("overall looks well," "in no distress"), 274 (looks well, "[c]erebellar function is normal"), 273 ("[h]e looks quite comfortable"), 381 ("[w]ell developed well nourished male in no distress," "[a]lert and oriented x 3," "[a]ffect appropriate"), 377-78 ("[w]ell developed well nourished male in no distress," "[a]lert and oriented x 3," "[a]ffect appropriate," "[n]o dizziness, no motor weakness, no sensory changes"), 374 (same)). And when Dr. Lackman did note abnormalities, they were minimal and failed to support his later assessment of extreme cognitive limitations. (See, e.g., AR 328 ("affect and behavior are normal," "speech is halting and he seems to frequently search for words"), 324 ("[l]ooks well with normal affect and behavior," "completely oriented," "able to do serial subtraction albeit slowly," "remembers one of 3 words at 5 minutes," "able to rep[ro]duce a clock face and spell 'world' backwards"), 323 ("[l]ooks physically well, flat affect, some psychom[o]tor retardation"), AR 379-80 ("[w]ell developed well nourished male in no distress," "[a]lert and oriented x 3,"

"[a]ffect appropriate," "[s]peech halting, processing speed very slow"), 375 ("[n]o dizziness, no motor weakness, no sensory changes," "[l]aughs somewhat inappropriately").)[17]  Such findings fail to support Dr. Lackman's determination that significant limitations existed.[18]

     In rejecting Dr. Lackman's opinion, the ALJ also correctly noted that he "never performed a thorough mental status examination."  (AR 33); §§ 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."), 416.957(c)(3) (same).  Plaintiff contends that Dr. Lackman "did perform a mental status evaluation, contrary to the ALJ's assertion," citing a November 2008 treatment note.  (J. Stip. at 3 (citing AR 324).)  But in that note, Dr. Lackman merely observed that Plaintiff was "completely oriented," "able to do serial subtraction albeit slowly," "remembers one of 3 words at 5 minutes," and could "rep[ro]duce a clock face and spell 'world' backwards."  (AR 324.)  Such brief findings are not a "thorough mental status examination" – particularly compared with the clinical interviews and battery of tests administered by the examining doctors – nor

_____

[17]Although some of these notes predate Plaintiff's March 2006 onset date, they postdate October 2005, when, Dr. Lackman said, Plaintiff's allegedly debilitating limitations first applied.  As such, they are relevant to determining whether his opinion was consistent with his own clinical records.

[18]Plaintiff's own reports of his symptoms, as reflected in Dr. Lackman's treatment notes, are suspect given Drs. Mitrushina and Shirman's finding that he tended to exaggerate his symptoms as a "plea for help."  (See AR 258, 268.)

do they support the extreme limitations reflected in Dr. Lackman's RFC assessment.

The ALJ also permissibly discounted Dr. Lackman's opinion because he "never recommended any specific specialized treatment for the continued complaints of decreased memory and concentration." (AR 33); see Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (holding that ALJ properly rejected opinion of treating physician who prescribed conservative treatment yet opined that claimant was disabled). Indeed, other than prescribing medication and referring Plaintiff to a neurologist – who merely diagnosed a concussion, ordered an MRI that revealed no abnormalities, and informed Plaintiff that he would continue to improve – Dr. Lackman provided very little treatment for Plaintiff's allegedly debilitating head injury. And although Plaintiff takes issue with the ALJ's finding, stating that the ALJ "does not state what treatment he expected [Plaintiff's] doctor to offer" and that "there is no cure for brain damage" (J. Stip. at 2), clearly some specialized treatment was available, as Drs. Mitrushina and Shirman recommended that if Plaintiff failed to return to his previous level of functioning, "he would benefit from enrollment in a cognitive remediation program," several of which were available in the Los Angeles area and "offer[ed an] interdisciplinary team approach to treatment" (AR 253-54).

Finally, the ALJ was entitled to rely on the opinions of examining psychologists Mitrushina, Shirman, and Roman instead of Dr. Lackman's because they were supported by independent clinical findings and thus constituted substantial evidence. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001);

21

1  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  In May

2  2006, Mitrushina and Shirman performed a comprehensive

3  neuropsychoevaluation of Plaintiff, including a clinical

4  interview and 18 neuropsychological tests.  (See AR 242-54, 260-

5  72.)  In July 2007, Dr. Shirman reevaluated Plaintiff, this time

6  performing a clinical interview and administering eight

7  neuropsychological tests; her findings were consistent with those

8  reflected in the previous report.  (AR 255-59.)  Moreover, in

9  February 2010, Dr. Roman reviewed Dr. Shirman's July 2007

10  assessment, performed a mental-status examination, and

11  administered four psychological tests.[19]  (AR 350-53);

12  §§ 404.1527(c)(3) (in weighing medical opinions, ALJ "will

13  evaluate the degree to which these opinions consider all of the

14  pertinent evidence in [claimant's] claim, including opinions of

15  treating and other examining sources"), 416.927(c)(3) (same).

16  Further, all three examiners specialized in psychology, whereas

17  Dr. Lackman, although a medical doctor, apparently did not

18  specialize in mental-health treatment.  (See AR 62 (claimant's

19  attorney's statement at hearing that Dr. Lackman was "not a

20  psychiatrist"); 20 C.F.R. §§ 404.1527(c)(5) ("We generally give

21  more weight to the opinion of a specialist about medical issues

22

23       [19]At the hearing, Plaintiff's counsel said that Plaintiff had
24  spent only 15 minutes with Dr. Roman; counsel indicated that his
    "impression" was that the four psychological tests could not be
25  completed in 15 minutes, but he did not specifically assert that
    the tests were not conducted.  (See AR 67.)  In the Joint
26  Stipulation, moreover, Plaintiff does not dispute that he took the
    tests.  (See J. Stip. at 24 (noting that "plaintiff reaffirmed that
27  he was issued the Trails A and B tests, the Bender Gestalt, the
    WAIS, and the Wechsler Memory Scale within that [15-minute] time
28  frame").)

related to his or her area of specialty than to the opinion of a source who is not a specialist."), 416.927(c)(5) (same); accord Smolen, 80 F.3d at 1285.  Thus, any conflict in the properly supported medical-opinion evidence was "solely the province of the ALJ to resolve."  Andrews, 53 F.3d at 1041.

Remand is not warranted on this basis.

B.   The ALJ Did Not Err in Assessing Plaintiff's Credibility

Plaintiff contends that the ALJ failed to properly evaluate his credibility.  (J. Stip. at 12-16, 20-21.)  As discussed below, however, the ALJ was likely entitled to reject Plaintiff's testimony because the record contained evidence of malingering; in any event, he provided clear and convincing reasons for discounting Plaintiff's testimony to the extent it was inconsistent with his RFC for a limited range of light work.

1.   Background

Plaintiff reported to examining psychologist Roman that he was unable to work because he "[c]an't concentrate for long periods, short term memory, difficulty making decisions, sometimes unable to recognize when decisions need to be made." (AR 350.)  Plaintiff also reported "experiencing feelings of hopelessness, worthlessness, fatigue, and tiring easily as well as suicidal ideation."  (Id.)  At the hearing before the ALJ, Plaintiff testified that he had a driver's license and drove every day, though he would "generally stick to a very local area" because otherwise he had "trouble finding where [he was] going and getting back." (AR 48-49.)  Plaintiff testified that he did not regularly visit friends and relatives or participate in

clubs, activities, or hobbies.  (AR 49.)  He said he suffered from "pain throughout [his] body most of the time" (AR 74); he could stand in one place without moving around for "maybe 10 minutes," sit for 10 or 15 minutes before needing to move around, walk for 10 or 15 minutes before having to rest, and sit for a total of two hours and stand and walk for a total of two hours in an eight-hour day (AR 75-76).  Plaintiff could lift 20 pounds but could repetitively lift only a "couple pounds."  (AR 76-77.)  He testified that he didn't have a lot of strength in his hands and had trouble typing.  (AR 77.)

2.   Applicable law

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there

24

is no showing that the impairment can reasonably produce the
degree of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in
original).  When the ALJ finds a claimant's subjective complaints
not credible, the ALJ must make specific findings that support
the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th
Cir. 2010).

Absent affirmative evidence of malingering, those findings
must provide "clear and convincing" reasons for rejecting the
claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's
credibility finding is supported by substantial evidence in the
record, the reviewing court "may not engage in second-guessing."
Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

3.   Analysis

The ALJ found that Plaintiff's "statements concerning the
intensity, persistence and limiting effects of [his] symptoms are
not credible to the extent they are inconsistent with" his RFC.
(AR 31.)  More specifically, the ALJ found Plaintiff to be
"partially credible" with regards to his mental impairments,
which the ALJ noted were the "major area of impairment."  (Id.)
Indeed, the ALJ largely accommodated Plaintiff's alleged
cognitive and psychological deficits by limiting him to light
work that involved only "simple routine work tasks," "semiskilled
work at most," "only occasional[] contact or interact[ion] with
coworkers, supervisors or the general public," "no work in a
fast-paced environment," and "low stress jobs, defined as only
occasionally making judgments."  (AR 30.)

Given Drs. Mitrushina and Shirman's finding that Plaintiff
exaggerated his symptoms (AR 258, 268), the ALJ was likely

relieved of his obligation to provide "clear and convincing"
reasons for rejecting Plaintiff's testimony.  See Bagoyan
Sulakhyan v. Astrue, 456 F. App'x 679, 682 (9th Cir. 2011) ("When
there is affirmative evidence of malingering . . . the ALJ is
relieved of the burden of providing specific, clear, and
convincing reasons to discount claimant's testimony."); Schow v.
Astrue, 272 F. App'x 647, 651 (9th Cir. 2008) ("the weight of our
cases hold that the mere existence of 'affirmative evidence
suggesting' malingering vitiates the clear and convincing
standard of review"); Flores v. Comm'r of Soc. Sec., 237 F. App'x
251, 252-53 (9th Cir. 2007) ("an ALJ may reject a claimant's
subjective pain testimony if the record contains affirmative
evidence of malingering").  In any event, as discussed below, the
ALJ's findings amply met the clear-and-convincing standard for
rejecting Plaintiff's testimony to the extent it conflicted with
the limited RFC.

     First, the ALJ reasonably found that Plaintiff's daily
activities were "inconsistent with [his] allegations of chronic
pain and decreased cognitive functioning."  (AR 32.)  Indeed,
Plaintiff reported to examining psychologist Roman that he lived
in an apartment with his parents, was able to perform most
activities of daily living but did not cook,[20] took walks
outside, got along "good" with relatives and "fair" with others,
and "spen[t] a typical day by reading and using a computer."  (AR
351.)  Plaintiff also testified that he drove every day in the
local area (AR 48-49) and had driven himself from his home in the

_____

     [20]In his SSI application, he stated, "I do not need help in
personal care, hygiene or upkeep of a home."  (AR 162.)

Santa Clarita Valley to the hearing in west Los Angeles (AR 44, 48-49).  The ALJ was entitled to rely on those daily activities to discount Plaintiff's credibility because they were inconsistent with his claims of completely debilitating cognitive and physical limitations.  See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ properly discounted claimant's testimony because "she leads an active lifestyle, including cleaning, cooking, walking her dogs, and driving to appointments"); Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").  Plaintiff also reported to Dr. Lackman that he was training for computer certification and doing some limited computer-repair work (AR 273, 324, 326, 328), though he later said he gave that up because it was too difficult (AR 323, 377).  As the ALJ noted, however, that Plaintiff "might not be able to do complex tasks such as computer repair, . . . would not preclude an ability to learn simpler tasks requiring little memorization or prolonged intense concentration."  (AR 33.)

The ALJ also noted that Plaintiff's testimony that he did not regularly visit friends and relatives (AR 49) was "somewhat inconsistent" with his ex-wife's statement showing that he frequently interacted with her and their children (AR 195) and therefore reduced his credibility.  (AR 31.)  In a statement submitted to the Appeals Council in response to the ALJ's decision, Plaintiff stated that he "testified that I did not regularly see my family and that would include my brother and my

27

parents, however, I have seen my children and ex-wife regularly."[21]  (AR 10; see also AR 275 (Plaintiff's report to Dr. Lackman that he had "very limited social contacts" but "see[s] his ex-wife and children on a daily basis").)  Such inconsistent statements further support the ALJ's credibility determination. See Smolen, 80 F.3d at 1284 (in assessing credibility, ALJ may use "ordinary techniques of credibility evaluation," such as "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"); accord Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008).

The ALJ also permissibly discounted Plaintiff's complaints based on fibromyalgia and other physical problems because "the record d[id] not reveal significant problems and d[id] not support [Plaintiff's] testimony."  (AR 31); see Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence").  Indeed, although Plaintiff consistently complained of physical ailments prior to his head injury – even seeking, unsuccessfully, to go on disability for them[22] – Dr. Lackman's notes postdating

---

[21]Plaintiff's statement that he did not regularly see his parents is also suspect given that he testified that he lived with them in an apartment and they paid all of his bills.  (AR 48-50.)

[22]In March 2004, Plaintiff apparently informed his provider that he "want[ed] to go on disability for his arthritis," but his provider responded that she "[u]nfortunately cannot put him on disability."  (AR 289.)  Plaintiff continued to work until March

1   Plaintiff's alleged onset date in March 2006 show that Plaintiff

2   primarily complained about cognitive impairment (see, e.g., AR

3   273-76, 324-25, 375-80) and only occasionally complained of

4   physical problems (see AR 328 (noting that Plaintiff was treating

5   "fibromyalgia-like syndrome" with ibuprofen and "an occasional

6   one half tablet of Vicodin"), 323 (noting that Plaintiff "[u]ses

7   Vicoden [sic] for joint pain"), 326 ("[i]ncreased knee pain" when

8   off medication), 381 ("back pain awak[en]s him at night"), 373

9   (complains of "ongoing bilateral knee and back pain since his

10  injury")).  Dr. Lackman, moreover, repeatedly noted that

11  Plaintiff looked well (AR 274-76, 323-24) or was "quite

12  comfortable" (AR 273; see also AR 374, 379, 381 (noting that

13  Plaintiff was "in no distress")) and had normal motor strength

14  (AR 274, 276, 373, 375, 377).[23]   Indeed, in the fibromyalgia

15

16  2006.  (See AR 50-54, 170-86.)

17      [23]Plaintiff contends that the treatment notes stating that he
    looked well and was comfortable predated his onset date of March
18  2006 (J. Stip. at 15), but as discussed, the notes postdating his
    onset date reflect similar findings.  Plaintiff also contends that
19  the ALJ incorrectly observed that "although [Plaintiff] had
    occasional headaches, he was not taking analgesics" (AR 32) because
20  in the mental-RFC questionnaire, "Dr. Lackman refers to [Plaintiff]
    taking heavy pain medication, including Soma and Vicodin" (J. Stip
21  at 16).   But the ALJ's observation appears in a summary of a
    January 2006 clinic note (AR 32), in which Dr. Lackman specifically
22  noted, "Occasional mild headaches, for which he takes no
    analgesics" (AR 277).  As such, the ALJ did not err.  Moreover, Dr.
23  Lackman did not indicate in his questionnaire that Soma and Vicodin
    were prescribed to treat Plaintiff's "occasional" headaches (see AR
24  384), and in fact, treatment notes indicate they were prescribed
    for other ailments (see, e.g., AR 323 ("[u]ses Vicoden [sic] for
25  joint pain"), 328 ("using ibuprofen about two tablets daily and an
    occasional one half tablet of Vicodin" to treat "fibromyalgia-like
26  syndrome"), 373 ("he has ongoing bilateral knee and back pain since
    his injury for which he uses vicoden [sic] and carisoprodol")).
27

28

questionnaire, Dr. Lackman noted that Plaintiff's symptoms did not "meet the American College of Rheumatology criteria for fibromyalgia."  (AR 389.)

Dr. Taylor, moreover, examined Plaintiff and found that his muscle tone, mass, and strength were normal; he had no deformity, swelling, or tenderness in any joint; his neck had full range of motion without pain or spasm; straight-leg raising was negative; he had no spasm along the back muscles; his sensation and reflexes were intact; and his gait was normal.  (AR 347-48.) Plaintiff's range of motion of the lumbar spine was "fairly good" and "only very minimally decreased"; overall Plaintiff moved his lumbar spine "with ease."  (AR 348.)  Dr. Taylor found that Plaintiff had no physical limitations.  (AR 349.)  Such findings fail to support Plaintiff's allegations that he was unable to sit, stand, or walk for more than 10 or 15 minutes at a time, sit or stand and walk for more than two hours total in a workday, or repetitively lift more than a couple pounds.  (AR 75-77.) Indeed, the ALJ concluded that Plaintiff's allegedly disabling fibromyalgia and back condition were nonsevere, findings Plaintiff does not challenge.

The ALJ was also entitled to partially discount Plaintiff's testimony regarding his cognitive impairments because psychological examinations "confirm problem areas but not to the extent that [Plaintiff] would be unable to perform any work." (AR 32.)  Indeed, as discussed in Section V.A, the examining psychologists interviewed Plaintiff and performed a battery of tests, which showed generally above-average function except in the areas of attention and working memory.  Such findings fail to

1  support Plaintiff's testimony that his cognitive impairment

2  prevented him from performing even a limited range of low-stress,

3  simple, and routine work with little social contact.

4      Because the ALJ's findings were supported by substantial

5  evidence, this Court may not engage in second-guessing.  <u>See</u>

6  <u>Thomas</u>, 278 F.3d at 959; <u>Fair v. Bowen</u>, 885 F.2d 597, 604 (9th

7  Cir. 1989).  Remand is not warranted.

8      C.  <u>The ALJ Did Not Err in Assessing the Third-Party</u>

9          <u>Statements</u>

10     Plaintiff contends that the ALJ erred because he "refer[red]

11  to statements from [Plaintiff's] ex-wife, brother, friend, and

12  co-worker, but does not explain the weight he assigned to those

13  statements." (J. Stip. at 22.)  For the reasons discussed below,

14  remand is not warranted on this ground.

15     "In determining whether a claimant is disabled, an ALJ must

16  consider lay witness testimony concerning a claimant's ability to

17  work." <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009)

18  (quoting <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053

19  (9th Cir. 2006) (internal quotation marks omitted)); <u>see also</u>

20  §§ 404.1513(d) (statements from therapists, family, and friends

21  can be used to show severity of impairments and effect on ability

22  to work), 416.913(d) (same).  Such testimony is competent

23  evidence and "*cannot* be disregarded without comment." <u>Bruce</u>, 557

24  F.3d at 1115 (quoting <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th

25  Cir. 1996) (internal quotation marks omitted)); <u>Robbins</u>, 466 F.3d

26  at 885 ("[T]he ALJ is required to account for all lay witness

27  testimony in the discussion of his or her findings.").  When

28  rejecting the testimony of a lay witness, an ALJ must give

31

specific reasons that are germane to that witness.  <u>Bruce</u>, 557
F.3d at 1115; <u>see also</u> <u>Stout</u>, 454 F.3d at 1053; <u>Nguyen</u>, 100 F.3d
at 1467.

     If an ALJ fails to discuss competent lay testimony favorable
to the claimant, "a reviewing court cannot consider the error
harmless unless it can confidently conclude that no reasonable
ALJ, when fully crediting the testimony, could have reached a
different disability determination."  <u>Stout</u>, 454 F.3d at 1056;
<u>see also</u> <u>Robbins</u>, 466 F.3d at 885.  But "an ALJ's failure to
comment upon lay witness testimony is harmless where 'the same
evidence that the ALJ referred to in discrediting [the
claimant's] claims also discredits [the lay witness's] claims.'"
<u>Molina</u>, 674 F.3d at 1122 (alteration in original) (quoting
<u>Buckner v. Astrue</u>, 646 F.3d 549, 560 (8th Cir. 2011)).

     Here, Plaintiff submitted four lay-witness statements
regarding his alleged cognitive impairments.  His ex-wife, Anne
Marie Brakeman, stated that she needed to "constantly remind"
Plaintiff of what he needed to do, such as make dinner for their
two children when she worked a night shift, and that Plaintiff
had become "completely unreliable and childlike and unable to
provide for his two children."  (AR 195.)  She stated that
Plaintiff called her "on at least two occasions" because he could
not find his car in a small grocery-store parking lot.  (<u>Id.</u>)
Plaintiff's friend, Matt Creeks, stated that Plaintiff often did
not return phone calls and had described his head injury and
difficulties finding his car in a parking lot.  (AR 196.)  Creeks
wrote that Plaintiff had asked him about "potential employment"
at the store where Creeks was a manager, but Creeks "had to

discourage him" because he "didn't feel [Plaintiff] would be someone to count on." (Id.)  Plaintiff's brother, Forrest Brakeman, stated that since his accident, Plaintiff had shown "an inability to consistently remember appointments and addresses" and "a marked decrease in certain memory functions, like the ability to memorize." (AR 198.)  Forrest[24] stated that he was unable to hire Plaintiff as a "boom operator," as he had in the past, because Plaintiff was no longer punctual and had to be able to memorize a script, which he could "no longer do reliably." (Id.)  Finally, Betsy Blake, Plaintiff's former supervisor, wrote that after the accident, Plaintiff had been "unable to perform at the level needed for the assistant director job" and "was not remembering details required for a job he performed with ease before the accident." (AR 212.)  Blake stated that after two months of training, Plaintiff was "unable to regain and retain the skills necessary to function in our fast paced, detail driven work environment" and she therefore stopped scheduling him for work.  (Id.)

The ALJ fully discussed the four lay-witness statements (AR 31-32), and Plaintiff's RFC is in fact largely consistent with them.  As the ALJ noted, Blake stated that Plaintiff was unable to return to his former fast-paced and detail-driven job, but that "does not automatically preclude an individual from doing unskilled and less stressful work." (AR 32.)  Similarly, Forrest stated that Plaintiff was unable to perform his previous work as a boom operator because he could not "remember appointments and

---

[24]Because Anne Brakeman and Forrest Brakeman share the same last name, the Court refers to them by their first names.

addresses" or "memorize a script," Anne stated that Plaintiff was forgetful and unreliable, and Creeks stated that Plaintiff was unreliable and socially withdrawn.  But those statements, too, do not necessarily conflict with the ALJ's finding that Plaintiff could perform low-stress, simple, routine work tasks with only occasional social contact.  (AR 30.)

In any event, to the extent the ALJ erred by failing to give germane reasons for rejecting the third-party statements, it was harmless because the statements described the same limitations as Plaintiff's own testimony, and the ALJ's reasons for rejecting Plaintiff's testimony "apply with equal force to the lay testimony."  Molina, 674 F.3d at 1122.  Plaintiff claimed that he was unable to work because he couldn't "concentrate for long periods," had poor short-term memory and difficulty making decisions, and was "sometimes unable to recognize when decisions need to be made."  (AR 350.)  As discussed in Section V.B, the ALJ provided clear and convincing reasons for discounting Plaintiff's statements, including that they were inconsistent with his daily activities and unsupported by the medical evidence.  Thus, because the ALJ provided "well-supported grounds for rejecting testimony regarding specified limitations," the Court "cannot ignore the ALJ's reasoning and reverse the agency merely because the ALJ did not expressly discredit each witness who described the same limitations."  Molina, 674 F.3d at 1121.  Because any error was harmless, Plaintiff is not entitled to reversal on this ground.

1          D.    <u>The ALJ Did Not Fail to Fully Develop the Record</u>

2          Plaintiff contends that the ALJ failed to fully and fairly

3    develop the record by ordering additional psychological testing

4    because the medical expert, Dr. Griffin, testified that

5    additional testing would be useful and "the ALJ appeared to agree

6    that further development was needed." (J. Stip. at 24.) For the

7    reasons discussed below, remand is not warranted on this ground.

8          In determining disability, the ALJ "must develop the record

9    and interpret the medical evidence." <u>Howard ex rel. Wolff v.</u>

10   <u>Barnhart</u>, 341 F.3d 1006, 1012 (9th Cir. 2003). Nonetheless, it

11   remains the plaintiff's burden to produce evidence in support of

12   his disability claims. <u>See</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 459

13   (9th Cir. 2001). "Ambiguous evidence, or the ALJ's own finding

14   that the record is inadequate to allow for proper evaluation of

15   the evidence, triggers the ALJ's duty to 'conduct an appropriate

16   inquiry.'" <u>Tonapetyan</u>, 242 F.3d at 1150.

17         At the hearing, Plaintiff's counsel asked Dr. Griffin

18   whether "any additional testing" would be "helpful in determining

19   if other psychological factors exist." (AR 64.) Dr. Griffin

20   responded that "my position is always that the more information

21   is better," which was "the position I'm obligated to take as a

22   professional." (AR 65.) Dr. Griffin stated that he would want

23   any such further examination to review "whether or not there is

24   the possibility of secondary gain, whether or not there is a

25   substance abuse history . . . , or whether there's a possible

26   personality disorder." (<u>Id.</u>) When asked whether any specific

27   test would be important, Dr. Griffin testified that Plaintiff

28   "would simply need a thorough psychological examination, clinical

35

1  history, and so forth." (AR 65.) Plaintiff's counsel then
2  requested the ALJ's "assistance" in ordering such an examination.
3  (Id.) The ALJ responded,

4      Okay. What would you – what would you look for? Because
5      we did our psychological CE and . . . it looks like they
6      did . . . the psychological testing that they normally do
7      as part of a CE. I am very limited in what I can
8      request.

9  (Id.) After more discussion, the ALJ told counsel that he would
10 "take your request under consideration." (AR 67.) At the end of
11 the hearing, the ALJ left the record open for 30 days so
12 Plaintiff could submit additional evidence (AR 84); he thereafter
13 submitted Dr. Lackman's mental-RFC and fibromyalgia
14 questionnaires (see AR 384-93).

15     The ALJ did not fail to fulfil his duty to further develop
16 the evidence. Contrary to Plaintiff's assertion, the ALJ did not
17 "appear[] to agree that further development was needed" (J. Stip.
18 at 24); rather, he noted that Dr. Roman already conducted some
19 psychological testing and informed counsel that he would take the
20 request for additional testing "under consideration" (AR 67).
21 The ALJ made no finding that the record was inadequate, and in
22 fact it appears to be quite well developed, as the ALJ obtained
23 separate consultative examinations of Plaintiff's mental and
24 physical conditions, the testimony of a psychological expert, and
25 opinions from several reviewing psychologists and physicians, all
26 in addition to Plaintiff's treatment records and Drs.
27 Mitrushina's and Shirman's evaluations. Plaintiff, moreover,
28 does not point to any specific ambiguous evidence that would have

36

triggered the ALJ's duty to further develop the record.  (See J. Untitled eventStip. at 24-26.)

Plaintiff nevertheless claims that the ALJ should have further developed the record because he "did not allow [Plaintiff] to testify as to his cognitive problems at the hearing."  (J. Stip. at 24 (citing AR 77).)  The evidence, however, fails to support that contention.  Rather, at the hearing the ALJ noted that he was familiar with the record and Plaintiff's brief regarding his head trauma.  (AR 54.)  After Dr. Griffin testified at length regarding Plaintiff's mental limitations (AR 55-72), the ALJ noted that the evidence regarding Plaintiff's physical problems was weak and asked counsel to point out "something objective showing fibromyalgia or arthritis or lumbar something" because the ALJ "didn't see it in the record" (AR 72).  Plaintiff's counsel responded that "the best sense [sic] to discover [Plaintiff's] physical problems are . . . to ask him what . . . physically would interfere with [his] ability to function."  (AR 73.)  After counsel and the ALJ questioned Plaintiff regarding his physical problems (AR 73-77), counsel said he had "no other questions" unless the ALJ "want[ed] [him] to establish the symptomology that [Plaintiff's] going through with mental health"; the ALJ responded, "No."  (AR 77.)  Thus, the ALJ merely indicated, on the page cited by Plaintiff, that he needed no additional development regarding the alleged cognitive limitations; he did not in any way prohibit Plaintiff from testifying about them.  Indeed, counsel never even requested that Plaintiff be allowed to do so.

In any event, even if the ALJ's duty to further develop the

37

record regarding Plaintiff's mental condition had been triggered, he met that duty by leaving the record open for an additional 30 days so Plaintiff could submit additional evidence.  (AR 83-84); see Tonapetyan, 242 F.3d at 1150 (ALJ may meet duty to develop record in "several ways," including by "keeping the record open after the hearing to allow supplementation of the record"); Hanbey v. Astrue, 506 F. App'x 615, 616 (9th Cir. 2013) (finding that even if ambiguous records "triggered the ALJ's duty to develop the record, the ALJ fulfilled that duty by according [claimant] the opportunity to supplement the record after the hearing had concluded").  Indeed, Plaintiff availed himself of that opportunity by submitting two medical opinions from Dr. Lackman, which the ALJ fully considered in rendering his decision.

Remand is not warranted on this ground.

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[25] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 25, 2014

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[25]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."